# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-621V

Filed: February 13, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| K.K. *a minor, by and through his parent* | * | Not For Publication |
| *and natural guardian*, RUSSELL KILDE, | * | |
| | * | |
| Petitioner, | * | Finding of Facts; Onset; Influenza ("Flu") |
| v. | * | Vaccine; Guillain-Barré Syndrome |
| | * | ("GBS") and Juvenile Idiopathic Arthritis |
| SECRETARY OF HEALTH | * | ("JIA") |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * | * | |

*Amy Senerth, Esq.*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Parisa Tabassian, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## RULING ON ONSET[1]

**Roth**, Special Master:

On May 9, 2017, Russell Kilde ("Mr. Kilde," or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq*.[2] ("Vaccine Act" or "the Program") on behalf of his minor child, K.K. Petitioner alleges that K.K. developed Juvenile Idiopathic Arthritis ("JIA") as a result of receiving an influenza vaccination on November 21, 2014. Amended Petition ("Am. Pet."), ECF No. 28.

---

[1] Although this Ruling has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id*.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

This Ruling is focused only on onset. I find preponderant evidence to support that K.K.'s limping and onset of his JIA began on November 24 or 25, 2014.

## I. Procedural History

The petition was filed on May 9, 2017, along with petitioner's vaccination and medical records. *See* Petition; Petitioner's Exhibits ("Pet. Ex.") 1-7, ECF No. 1. Petitioner initially alleged that K.K. developed Guillain-Barré Syndrome ("GBS") as a result of the influenza vaccination. Petition ("Pet."), ECF No. 1.

Petitioner filed additional medical records on August 23, 2017; September 8, 2017; and October 11, 2017. Pet. Ex. 8-11, ECF No. 11-12, 14. Respondent's status report filed on December 19, 2017 indicated that he was satisfied that the record was complete and that he was not amenable to settlement discussions. ECF No. 18.

On September 14, 2018, petitioner filed an amended petition, an expert report from Dr. Morrison, and an expert report from Dr. Gershwin. Am. Pet., ECF No. 28; Pet. Ex. 12, ECF No. 29; Pet. Ex. 13, ECF No. 30. The Amended Petition clarified that petitioner was alleging Juvenile Idiopathic Arthritis ("JIA") as the injury resulting from his November 21, 2014 flu vaccination. Am. Pet., ECF No. 28.

This matter was reassigned to the undersigned on September 18, 2018. ECF No. 32.

On March 25, 2019, respondent filed his Rule 4(c) Report and responsive expert reports by Dr. Carlos Rose and Dr. S. Mark Tompkins. Respondent's Report ("Resp. Rpt."), ECF No. 42; Respondent's Exhibit ("Resp. Ex.") A-D, ECF No. 43. Respondent recommended against compensation in this matter. Resp. Rpt. at 2, ECF No. 42.

On May 30, 2019, during a Rule 5 status conference, the undersigned informed counsel that a fact hearing to determine onset would be necessary. ECF No. 47. The parties agreed to April 23, 2020 for the Onset Hearing. Joint Status Report, ECF No. 48. On December 3, 2019, petitioner filed the affidavit of Russell Kilde. Pet. Ex. 14, ECF No. 52. Two days before hearing, petitioner filed the affidavit of Hisa Kilde. Pet. Ex. 15, ECF No. 58.

Due to the COVID-19 pandemic, the Onset Hearing was rescheduled for and held on October 14, 2020. ECF No. 55.

After the hearing, petitioner was ordered to file additional medical records and videos or photos of K.K., as well as social media data, between April 2014 through 2016. ECF No. 59. Petitioner filed the requested records on December 21, 2020, Pet. Ex. 16, ECF No. 62; January 6, 2021, Pet. Ex. 17, ECF No. 63; and April 12, 2021, Pet. Ex. 18-28, ECF No. 68. The record was then closed for the purposes of this Ruling. ECF No. 72.

The matter is now ripe for a Ruling on Onset.

## II.   The Factual Record

### A.   K.K.'s Medical Records

#### a.   Pre-Vaccine Medical History

K.K. was born on December 30, 2012. Pet. Ex. 1. In his first year of life, K.K. received routine vaccinations without event. *Id*.; Pet. Ex. 2 at 75-76, 101-02. According to his well-child visits, he was meeting all milestones expected for his age. Pet. Ex. 2 at 48, 70, 84, 105, 121, 136.

K.K. had his 9-month-old well child visit on October 9, 2013, where it was noted that he had a fall. Pet. Ex. 2 at 121. He had blood tests that day, which showed that his hemoglobin[3] was low. *Id*. at 126-28, 134. His mother had his hemoglobin checked again while in Japan, and she reported that his levels were normal. *Id*. at 136.

After his first birthday, in April of 2014, K.K. presented to pediatrician Dr. Ross with a rash on his chest, abdomen, and upper arms. His mother also reported that K.K. had fallen down the stairs. Pet. Ex. 2 at 147-48. Upon examination, Dr. Ross documented that his skin was "clear, no rash or abnormal pigmentation." *Id*. at 148. His hemoglobin was rechecked and noted to be elevated. *Id*. at 153.

At a visit on July 2, 2014, K.K.'s mother reported a mass on K.K.'s neck. Dr. Ross examined him and noted that his "neck is supple and thyroid is normal, no masses. Small posterior cervical node high within chain." Pet. Ex. 2 at 161-62. He was also noted to be walking normally for his age. *Id*. at 162. His hemoglobin was checked again and was normal. *Id*. at 167.

On November 21, 2014, K.K. received an influenza vaccine in his left thigh. Pet. Ex. 1; Pet. Ex. 8 at 1.

#### b.   Post-Vaccine Medical History

K.K. presented to pediatrician Dr. Andersen on December 12, 2014 for a rash that began the day prior and gait problems for the last three weeks after sleeping. The record includes, "[d]ifficulty walking consistently occurs in mornings over the last couple weeks, without worsening or resolving. Would rather crawl than walk, cries. Better later in day with gait normal. Also noted to occur after waking up from naps." Pet. Ex. 2 at 173-74. Further, K.K. was waking and crying "4-5 times at night over last couple weeks, which is unusual for him." *Id*. at 173. Upon examination, Dr. Andersen noted that K.K. resisted "standing up when placed in seated position on the floor . . . prefers to slide along the floor on his left hip pulling forward with left arm." *Id*. at 174. He was diagnosed with rash, otitis media, and gait abnormality. *Id*. The pediatrician believed his rash was due to a viral infection. The parents were advised to take a "[w]atchful waiting" approach. *Id*.

---

[3] Hemoglobin is the red oxygen-carrying pigment of erythrocytes, formed by developing erythrocytes in bone marrow. *Hemoglobin, Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=22033 (last visited Feb. 13, 2023).

K.K. had a follow up with Dr. Ross on January 8, 2015, where it was noted that he had been limping for the past two months, which seemed to start after a viral illness. Pet. Ex. 2 at 183. K.K. had presented about a month ago. *Id*. His limp had gotten worse and his left second toe appeared swollen. K.K.'s pain was worse in the mornings and better with activity. *Id*. Dr. Ross was "unable to completely extend [K.K.'s] knees bilaterally." *Id*. at 184. X-rays were normal but bloodwork revealed high ESR,[4] suggestive of inflammation. *Id*. at 189-90, 202.

On January 15, 2015, K.K. was presented to a pediatric orthopedist. His parents reported that K.K. had a viral illness in the middle of November 2014 and started limping shortly thereafter; they stated that his limping started two months ago. Pet. Ex. 3 at 11-12; Pet. Ex. 5 at 42. His parents reported that K.K. was a "normal, active 2 year old" prior to November 2014 and that he received his flu vaccine after symptoms started. Pet. Ex. 3 at 11-12; Pet. Ex. 5 at 42. A pediatric neurologist suspected that K.K. had GBS,[5] so he was admitted and had an MRI and lumbar puncture and was started on IVIG. Pet. Ex. 4 at 6-8; Pet. Ex. 5 at 35-37. K.K. had some benefit from the IVIG, but then reverted to scooting and was again not climbing stairs. Pet. Ex. 4 at 25-26.

On January 17, 2015, K.K. was discharged. The discharge summary notes that K.K. had been limping for two months and a week prior to his symptoms had an upper respiratory infection with cough, congestion, and fever. Pet. Ex. 5 at 36.

On January 21, 2015, K.K. was seen by Dr. Ross for follow up of his hospitalization. Pet. Ex. 2 at 213-14. His parents reported that they had not noticed any major improvements in his symptoms, but he had not gotten worse. *Id*. at 214. Upon examination, Dr. Ross was "able to elicit left knee reflex." *Id*. at 213.

K.K. had a follow up on February 3, 2015. Pet. Ex. 4 at 26. He refused to bear weight and resisted foot contact with the floor. *Id*. He also complained that a light touch of his right arm and leg hurt. *Id*. The impression was a predominately sensory neuropathy. *Id*.

K.K. was presented to physical therapy on February 19, 2015. Pet. Ex. 10 at 348. Petitioner reported that K.K. was walking, running, and jumping prior to November 2014. *Id*. Now, he was unable to walk or climb stairs, unable to sit and stand independently, and unable to maintain

---

[4] ESR refers to erythrocyte sedimentation rate. An increase in ESR is usually due to elevated levels of plasma proteins, especially fibrinogen and immunoglobulins, which decrease the zeta potential on erythrocytes by dielectric shielding and thus promote rouleau formation. It is increased in monoclonal gammopathy, hypergammaglobulinemia due to inflammatory disease, hyperfibrinogenemia, active inflammatory disease, and anemia. *Erythrocyte Sedimentation Rate, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=102146* (last visited Feb. 9, 2023).
[5] GBS is a rapidly progressive ascending motor neuron paralysis of unknown etiology, frequently seen after an enteric or respiratory infection. An autoimmune mechanism following viral infection has been postulated. It begins with paresthesias of the feet, followed by flaccid paralysis of the entire lower limbs, ascending to the trunk, upper limbs, and face; other characteristics include slight fever, bulbar palsy, absent or lessened tendon reflexes, and increased protein in the cerebrospinal fluid without a corresponding increase in cells. *Guillain-Barré syndrome, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=110689* (last visited Feb. 9, 2023).

"quadruped". *Id*. K.K. was not bearing weight through his "RUE" and relied on his right forearm to stabilize. *Id*. at 349. "Parents report that [K.K.] has just recently started performing this activity." *Id*. The onset date of his limping was listed as November 22, 2014, the day after he received the flu vaccine. *Id*. at 348.

K.K. continued to be evaluated and treated throughout 2015 and into 2016 as having GBS following vaccination. *See* Pet. Ex. 4 at 25, 102; Pet. Ex. 7 at 21, 24; Pet. Ex. 8 at 4. After consulting a rheumatologist and neurologist on May 6, 2016, his diagnosis was changed to juvenile idiopathic arthritis. Pet. Ex. 11-1 at 3-6; Pet. Ex. 7 at 48.

### B.   Affidavits and Testimony of the Witnesses

#### a.   Petitioner Russell Kilde

Petitioner filed one affidavit and testified at the onset hearing. Pet. Ex. 14.

Petitioner stated that K.K. had a cold in early November, so he and his wife pushed his flu vaccine off until he was well. Tr. 95-96, 115-16. Once K.K. recovered from his cold and "seemed normal and healthy", he received a flu vaccine on November 21, 2014. Pet. Ex. 14 at 1; Tr. 96.

"Within a couple of days" after receiving the vaccine, K.K. came down with another cold. Pet. Ex. 14 at 1. Petitioner thought K.K.'s cold was related to the flu vaccine, because he had similar symptoms following a flu vaccine in the past. Tr. 102. K.K. was not presented to a doctor for his symptoms as they were not considered serious. Tr. 103. By Thanksgiving, or November 27, 2014, K.K. was slow getting out of bed and was experiencing pain in his legs. Tr. 99.

According to petitioner, K.K.'s leg pain started in his knees but only occurred in the morning after sleeping. Pet. Ex. 14 at 1; Tr. 126. Petitioner estimated that the limping began at the end of November, associating the leg pain with Thanksgiving that year. Tr. 91, 99, 128. He recalled that K.K. did not have trouble walking in the fall of 2014, but he was certain that K.K. was struggling to walk by the end of November that year. Tr. 95, 99, 117. "I don't remember [K.K.] limping before the vaccine." Tr. 113.

Petitioner recalled K.K. presenting to the pediatrician on December 12, 2014 for a rash on his torso that was "large" and "scary". Tr. 88, 129, 134.

By mid-December of 2014, K.K. was limping all day and refusing to walk, so his parents carried him everywhere. Tr. 93, 100, 125-26. Petitioner clarified that K.K. was still able to walk but that he no longer wanted to and wanted to be carried everywhere. Tr. 125-26. Because of his difficulty walking, K.K.'s mother bought him a stroller for either Christmas or his birthday on December 30 in the hopes that he would use it like a walker to assist in ambulating. Tr. 121-23, 126. Petitioner confirmed that K.K. was limping constantly by his appointment on January 15, 2015. Tr. 93-95, 100.

Petitioner acknowledged the inconsistencies between his affidavit and the medical records regarding the onset of K.K.'s limping. Pet. Ex. 14 at 2; Tr. 118, 126. He explained at hearing that

5

he was merely referring to the months and not considering the actual dates on which the events transpired.[6] Tr. 97, 114.

### b. Petitioner's Wife, Hisa Kilde

Petitioner's wife filed an affidavit and testified at the onset hearing. Pet. Ex. 15. Notably, English is not Mrs. Kilde's first language.

Mrs. Kilde affirmed that K.K. had a cold prior to receiving the subject vaccine in late October of 2014, which led her and husband to postpone K.K.'s flu vaccine. Tr. 14, 24-25. Mrs. Kilde did not remember anything in particular about November 21, 2014, the day K.K received the flu vaccine, other than bringing K.K. and her other son to the doctor that day for K.K.'s flu shot. Tr. 13-14, 20. At the time of the appointment, his limping and leg pain had not yet begun. Tr. 15. In fact, he was running. Tr. 26. She testified that she had never noticed any difficulty with his walking or limping prior to November of 2014. Tr. 22.

"A few days after the shot," K.K.'s leg began hurting. Pet. Ex. 15 at 1; Tr. 52. She noticed that "[h]e couldn't take one step from the bed. He say (sic) 'owie, owie.' He cried." Tr. 15, 54. Mrs. Kilde stated that her older son was not at home when K.K. awoke the first time crying; her older son was at school. Tr 33. She could not recall the exact date that K.K.'s symptoms began, but she estimated that it was two or three days after the flu shot—around November 24 or 25, 2014. Tr. 20-21, 33, 53.

Mrs. Kilde said K.K.'s pain would start in the morning and then subside within a short period of 10-30 minutes. Tr. 18. When he first started having symptoms, K.K. was still walking and running around in the late afternoon. Tr. 18, 33.

By Thanksgiving Day, K.K. was having "pain in the morning when he woke up." Tr. 19. Mrs. Kilde recalled telling her mother-in-law about his symptoms on Thanksgiving. Tr. 19. But when the family was together later in the day, K.K. was fine, running around and walking like normal. Tr. 55-56.

Mrs. Kilde took him to the pediatrician on December 12, 2014, because he had a large rash. Tr. 16, 23. She also reported at that visit that he had been limping for three weeks. Tr. 23. She later clarified that three weeks was an estimate. Tr. 26, 27, 65-66.

Mrs. Kilde noted that around Christmas 2014, K.K.'s symptoms had gotten worse. Tr. 42. At that time, he was mostly sitting and did not want to move. Tr. 42. For either Christmas or his birthday that year, Mrs. Kilde got K.K. a baby stroller so he would have some assistance while walking. Tr. 42-43, 59, 61-62.

Mrs. Kilde affirmed that at the end of December 2014 or beginning of January 2015, K.K. was no longer able to walk and was scooting instead. Tr. 75. She acknowledged the January 8, 2015 appointment, but stated that the notes indicating K.K. had been limping for two months were

---

[6] Petitioner also noted that his rough estimations of when K.K.'s limping began could have influenced what his wife reported to doctor, as English is her second language. Tr. 127.

incorrect. Tr. 22-24, 70-71. The reason the notes may have indicated symptoms starting two months ago was because his limping started in the month of November; she did not account for the exact date. Tr. 22, 71.

In discussing the next appointment on January 15, 2015, Mrs. Kilde confirmed that she had estimated the onset as being roughly two months prior. Tr. 31. However, she did not provide an exact date, so two months exactly—or sixty days—was incorrect. Tr. 31, 70-71. She explained that her use of "two months" prior was similar to her estimate at the prior appointment of "three weeks." It was a rough estimate. Tr. 71.

When asked about the visit notes from January 15, 2015 that stated K.K. received the flu vaccine "after symptoms started", Mrs. Kilde claimed that the notation was incorrect. Tr. 34-36; *see also* Pet. Ex. 5 at 42. Mrs. Kilde insisted that K.K.'s symptoms began two to three days after the subject vaccine. Tr. 36.

### C. Video Footage

After the hearing, petitioner was ordered to file any photos or video footage of K.K. taken by his parents, grandparents, relatives, or family friends between April 2014 through the end of 2016. ECF No. 59. Petitioner filed several videos on April 12, 2021. Pet. Ex. 18-28, ECF No. 68.

#### a. Pre-Vaccination Videos

Petitioner filed a video dated October 31, 2014, showing K.K. walking around, standing, and squatting while his father carved pumpkins. Pet. Ex. 19. The video dated November 7, 2014 showed K.K. picking up and carrying a cat. Pet. Ex. 28.

There are two videos from November 13, 2014. One showed K.K. running across the room, jumping onto a recliner, and playfully kicking his legs; the other showed K.K. leaning across a coffee table while walking to grab a book. Pet. Ex. 21-22.

#### b. Post-Vaccination Videos

A video dated November 22, 2014, one day after K.K. received the flu vaccine shows K.K. playing outside with his brother, picking up and throwing snow. Pet. Ex. 20. A video dated November 27, 2014, Thanksgiving, shows K.K. putting decorations on a Christmas tree taking only a few small steps around the tree. Pet. Ex. 25.

A video dated December 1, 2014, shows K.K. playing with toys on the coffee table. Pet. Ex. 24. A video dated December 19, 2014 shows K.K. running across the room and playing with petitioner. Pet. Ex. 23.

A video dated December 24, 2014, Christmas Eve, shows K.K. standing in one place, taking only a few steps throughout the video, and sitting in his father's lap. Pet. Ex. 18. In a

December 25, 2014 video, petitioner is carrying K.K. to the Christmas tree, setting him down, and bringing toys to him. Pet. Ex. 27. K.K. does not stand or walk in the video.

The last video filed was dated December 30, 2014, K.K.'s 2nd birthday. Pet. Ex. 26. In the video he is sitting on the ground, opening a present (a pink stroller). He does not stand up or walk.

### III.     Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing his claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.,* No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), vacated on other grounds, *Sanchez by & through Sanchez v. Sec'y of Health & Human Servs.*, No. 2019-1753, 2020 WL 1685554 (Fed. Cir. Apr. 7, 2020), review denied, *Sanchez by & through Sanchez v. Sec'y of Health & Hum. Servs.*, 152 Fed. Cl. 782 (2021); *Cucuras v. Sec'y of Health & Human Servs*., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F. 2d. 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"). In making contemporaneous reports, "accuracy has an extra premium" given that the "proper treatment hang[s] in the balance." *Id.* A patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs*., 28 Fed. Cl. 516, 523 (1993); *see Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Cucuras*, 993 F.2d at 1528. Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Id.*

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). In short, "the record as a whole" must be considered. § 13(a).

### IV.    Discussion and Findings of Fact

Petitioner alleges that K.K. developed JIA as a result of the flu vaccine he received on November 21, 2014. Am. Pet. The focus of this Ruling is only the onset of K.K.'s leg pain and limping. Viewing the record as a whole, preponderant evidence exists to support the onset of K.K.'s symptoms as on or about November 24 or 25, 2014.

K.K.'s medical records show that he was developing normally and meeting all milestones for his age throughout his first almost two years of life. Pet. Ex. 2 at 48, 70, 84, 105, 121, 136. His records show, and petitioner and Mrs. Kilde confirm, that K.K. was walking and running normally in the fall of 2014, before the November 21, 2014 flu vaccine. Pet. Ex. 2 at 162; Pet. Ex. 3 at 11-12; Tr. 15, 22, 26, 95, 99, 113, 117; Pet. Ex. 19; Pet. Ex. 28. A video dated November 13, 2014 shows K.K. playing with petitioner, running around, and playfully kicking his legs. Pet. Ex. 21. This video was taken approximately eight days before K.K. received the subject flu vaccine.

Petitioner and Mrs. Kilde recalled that K.K. had a cold prior to his receipt of the flu vaccine, which caused them to delay his flu vaccination. Tr. 14, 24-25, 95-96, 115-16; Pet. Ex. 14 at 1. After he recovered from the cold, K.K. was presented to his pediatrician's office on November 21, 2014 to receive flu vaccine. Tr. 14, 24-25, 96. A video dated November 22, 2014, the following day, shows K.K. running and playing in the snow with his brother. Pet. Ex. 20. K.K. repeatedly squats to pick up snow, throws it, and runs to a different spot to grab more, all without any apparent pain. *Id*.

Petitioner testified that K.K. appeared to have another cold a few days after his receipt of the flu vaccine, but he didn't think much of it because he had experienced similar symptoms himself following a flu vaccine in the past. Tr. 102; Pet. Ex. 14 at 1. K.K. was not seen by a doctor because his symptoms were not serious. Tr. 103.

Mrs. Kilde estimated that K.K.'s legs began hurting two to three days after his shot or around November 24 or November 25, 2014. Mrs. Kilde recalled K.K. crying in the morning, saying "owie", and having a difficult time bearing weight. She further recalled her older son being at school that day, so it was either Monday or Tuesday, November 24 or 25 because school was likely closed Wednesday and Thursday for the Thanksgiving holiday. Pet. Ex. 15 at 1; Tr. 15, 33, 52, 54. This is consistent with Mrs. Kilde's reporting onset as being a few days after the flu vaccine and before Thanksgiving. Tr. 20-21, 33, 53. Both petitioner and Mrs. Kilde remembered that K.K.'s symptoms had already begun by Thanksgiving, or November 27, 2014. Tr. 19, 55-56, 91, 99, 128.

Further, petitioner and Mrs. Kilde both explained that they provided estimates of the onset of K.K.'s pain and limping to his medical providers, not exact dates. Pet. Ex. 14 at 2; Tr. 22-24, 26, 27, 31, 36, 65-66, 70-71, 118, 126. Mrs. Kilde explained that her estimate of his limping and leg pain was three weeks prior to the December 2014 appointment, because she knew it was more than two weeks ago when she took K.K. to the doctor. Tr. 26, 27, 66. Similarly, when questioned about their reporting onset as two months prior when presenting K.K. on January 8 and 15, 2015, they both explained that they were referring to the general month of onset and not the actual date his symptoms began. Tr. 97, 114. Petitioner believed that Mrs. Kilde may have relied on his rough estimations because English is not her first language. Tr. 127. Notably, petitioner and Mrs. Kilde were sequestered during their testimony.

The preponderant evidence supports that petitioner and Mrs. Kilde provided estimates to medical providers regarding the relevant timeframe within which K.K.'s limping and leg pain began rather than exact dates. They reported onset three weeks prior to a December 12, 2014 medical visit, which would have placed onset on the day of the flu vaccine. However, a video showed K.K. running and playing the next day with no apparent pain or limping. Pet. Ex. 20. At medical visits on both January 8, 2015 and January 15, 2015, they reported onset as two months ago. If taken literally, that would place onset prior to K.K.'s receipt of his flu vaccination on November 21, 2014. However, videos show on October 31, 2014, K.K. was walking around, standing, and squatting while his father carved pumpkins. Pet. Ex. 19; on November 7, 2014, K.K. was picking up and carrying a cat. Pet. Ex. 28; on November 13, 2014, one video showed K.K. running across the room, jumping onto a recliner, and playfully kicking his legs; and the other showed K.K. leaning across a coffee table while walking to grab a book. Pet. Ex. 21-22. A video

10

a day after the flu vaccine shows K.K. playing outside with his brother, picking up and throwing snow. Pet. Ex. 20.

In the weeks that followed his vaccination, however, the videos filed show a less active child. On November 27, 2014, Thanksgiving, a video shows K.K. putting decorations on a Christmas tree taking only a few small steps around the tree. Pet. Ex. 25. On December 1, 2014, a video shows K.K. playing with toys on the coffee table. Pet. Ex. 24. A video dated December 19, 2014 shows K.K. running across the room and playing with petitioner. Pet. Ex. 23. This is consistent with the parents' testimony that when the symptoms first started, K.K. was still walking and running around in the late afternoon. Tr. 18, 33. Both parents testified that by Thanksgiving, K.K. was having "pain in the morning when he woke up" but was still running and walking normally in the afternoon. Tr. 19, 55-56. A video dated December 24, 2014, Christmas Eve, shows K.K. standing in one place, taking only a few steps throughout the video, and sitting in his father's lap. Pet. Ex. 18. On Christmas day, a video shows petitioner carrying K.K. to the Christmas tree, setting him down, and bringing toys to him. Pet. Ex. 27. K.K. does not stand or walk in the video. In a December 30, 2014 video, K.K.'s 2nd birthday, he is sitting on the ground, opening a present (a pink stroller). He does not stand up or walk. Pet. Ex. 26. The corroborating evidence supports petitioner and Mrs. Kilde's references to the onset of K.K.'s limping and leg pain being estimates rather than exact dates. Pet. Ex. 2 at 183; Pet. Ex. 5 at 42.

This is the type of scenario the Court of Federal Claims contemplated when purported inconsistencies exist between the contemporaneously created medical records and later testimony. *See La Londe*, 110 Fed. Cl. at 203-04. Though the onset of symptoms here was reported as three weeks before the December 12, 2014 appointment and two months before the January 8 and 15, 2015 appointments, all placed onset in the month of November 2014. Thus, the medical records do not contradict the parents' memory of when K.K.'s leg pain and limping began, which was just before Thanksgiving. Further, both parents recalled K.K.'s symptoms being present during Thanksgiving 2014. Petitioner recalled having to carry K.K. and Mrs. Kilde discussed K.K.'s leg pain and limping with her mother-in-law. Tr. 19, 93, 100, 125-26.

Succinctly, the medical records show that petitioner and Mrs. Kilde provided estimates for the onset of K.K.'s leg pain and limping. Neither parent noticed any symptoms prior to the flu vaccine. Tr. 15, 113. Mrs. Kilde stated that K.K.'s leg pain and limping began two to three days after he received the flu vaccine on November 21, 2014. Tr. 20-21, 33, 53. Both parents were adamant that his symptoms were present by Thanksgiving, or November 27, that year. Tr. 19, 55-56, 91, 99, 128. Corroborating evidence by way of videos supports both parents' testimony. The videos filed in this matter show K.K. running and playing both before and the day after his flu vaccine. Pet. Ex. 19-22, 28. However, thereafter, the videos show a less active child, taking only a few steps, sitting, or being carried. Pet. Ex. 18, 23-27. By either December 25 (Christmas) or December 30 (K.K.'s birthday) he was given a stroller in hopes that he would walk holding on to something. Tr. 42-43, 59, 61-62, 121-23, 126. In the video showing K.K. opening this present, he is sitting on the ground and tearing wrapping paper with the help of his brother. K.K. does not stand up or walk at any point in the video. Pet. Ex. 26.

This Ruling is a determination only as to onset of K.K.'s leg pain and limping. Viewing the record as a whole and for the reasons set forth above, I find preponderant evidence to support

that the onset of K.K.'s leg pain and limping began a few days after receipt of his flu vaccine on November 21, 2014 or on or about November 24 or 25, 2014.

## V. Conclusion

Upon detailed review of the record in its entirety, I find that petitioner's symptoms began on or about November 24 or 25, 2014.

To continue pursuing his claim, petitioner must file an expert report which relies on the facts as found in this Ruling. Should petitioner's expert base their opinion on facts not substantiated by this Ruling, the expert's report will be disregarded. *See Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

Accordingly, the following is ORDERED:

**By <u>Thursday, March 30, 2023</u>, petitioner shall file either an expert report that is based on the onset as found herein, or a status report indicating how he intends to proceed.** Petitioner shall provide a copy of this Onset Ruling to each of his expert witnesses, and his expert(s) shall rely on the timing of onset as I have found it in this Ruling. If petitioner is unable to secure reports from his expert(s) based on the timing of onset as I have found it, he shall file either a motion to dismiss, a joint stipulation for dismissal, or a motion for a ruling on the record, all of which will result in the dismissal of his claim.

**IT IS SO ORDERED.**

<u>s/Mindy Michaels Roth</u>
Mindy Michaels Roth
Special Master